# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 10-CR-074 (JFB)

---

UNITED STATES OF AMERICA,

versus

ALDALBERTO ARIEL GUZMAN,

Defendant.

---

**MEMORANDUM AND ORDER**
July 26, 2012

---

JOSEPH F. BIANCO, District Judge:

On May 21, 2010, the government filed a Juvenile Information against defendant Aldalberto Ariel Guzman ("Guzman" or "the defendant") charging him with one count of conspiracy to commit murder in aid of racketeering, 18 U.S.C. § 1959(a)(5); two counts of murder in aid of racketeering, 18 U.S.C. § 1959(a)(1); two counts of discharging a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii); and two counts of causing the death of another through the use of a firearm, 18 U.S.C. § 924(j)(1). Specifically, Guzman is charged with participating, in aid of the racketeering activities of the MS-13 street gang, in the execution-style murder of a nineteen-year-old woman and her two-year-old son in the woods of Central Islip on February 4, 2010.

The government subsequently moved, pursuant to 18 U.S.C. § 5032, to transfer the case to district court in order to prosecute the defendant as an adult. On November 29, 2010, after written submissions had been filed with the Court, the Court conducted an evidentiary hearing on the government's transfer motion. On December 14, 2010, the Court issued a Memorandum and Order transferring the case to district court for prosecution of the defendant as an adult.

On September 16, 2011, Guzman moved to suppress statements he made to law enforcement officers after his arrest on May 17, 2010, arguing that his waiver of his *Miranda* rights was not knowing and voluntary due to the circumstances surrounding his interrogation and the failure of law enforcement officials to contact his mother after his arrest. On October 7, 2011, the government opposed the motion to suppress. On December 5, 2011, the Court conducted an evidentiary hearing regarding Guzman's motion. The Court allowed the defendant to submit a post-hearing letter, which was filed on December 20, 2011. The government responded on December 23, 2011. Trial is scheduled to commence on September 10, 2012.

For the reasons that follow, the motion to suppress is denied. In particular, Guzman argues, *inter alia*, that his post-arrest statements should be suppressed because it is undisputed that the law enforcement agents failed to notify his parents of his arrest as is required for a juvenile under the Juvenile Delinquency Act.

As a threshold matter, although neither the Supreme Court nor Second Circuit has addressed this precise issue, the Court holds that violations of the Juvenile Delinquency Act's parental notification requirement at the time of the juvenile's arrest do not require a *per se* suppression of the juvenile's post-arrest statements. The plain language of the statute does not require such a remedy, and such a rule could easily lead to absurd results that were clearly not intended by Congress. Here, the law enforcement agents had clear and compelling law enforcement reasons for deciding not to make the parental notification – namely, (1) agents believed that Guzman's mother had assisted Guzman and his co-conspirators' flight to El Salvador after the murders, (2) agents were on the ground in El Salvador at the time of Guzman's arrest in the United States looking for one of Guzman's co-conspirators, and (3) agents were reasonably concerned that, if notification was made of Guzman's arrest to his mother, that family or friends would alert the co-conspirator in El Salvador of this development and thereby jeopardize the safety and law enforcement objectives of the agents in El Salvador in locating the co-conspirator. *Per se* suppression of Guzman's post-statements under these circumstances would provide a judicial windfall to Guzman, even though no such remedy is dictated by the plain language of the statute, or the United States Constitution. Thus, this Court declines to impose such a *per se* suppression remedy for a violation of this statutory (rather than constitutional) rule.

Instead, the Court adopts the approach of the Sixth Circuit and holds that, under these circumstances, the test remains the same as utilized for analyzing post-arrest statements generally – that is, whether the *Miranda* waiver was knowingly, voluntarily, and intelligently made under the totality of the circumstances. Under that test, the lack of parental notification is simply one factor, among many – including the juvenile's experience and background, the conditions of the interrogation, and the conduct of the law enforcement officials – that the Court must consider under the totality of the circumstances.

Applying that test, the Court finds that Guzman's *Miranda* waiver was knowing, intelligent, and voluntary. First, Guzman was read his *Miranda* rights and signed a written waiver. Second, with respect to his personal characteristics, Guzman was only four days shy of his eighteenth birthday at the time of his arrest, was capable of logical and coherent thinking, was familiar with the criminal justice system because of his prior arrests, and had lived independently of his mother for several months in El Salvador. Third, the conditions of interrogation were conducive to a voluntary waiver in that, *inter alia*, he was given food and drink, allowed to use the bathroom, and questioned in a calm environment. Fourth, he was not subjected to any threatening or coercive statements or conduct by the interviewing law enforcement agents. Fifth, he did not ask to speak to his mother or an attorney. Having conducted a full evidentiary hearing (including an evaluation of the demeanor of the testifying witnesses), the Court finds Guzman's version of the events in his affidavit to be wholly incredible and, instead, fully credits the version of the interviewing agents as elicited at the hearing. Accordingly, the Court finds that the government has met its burden of

proving by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights.

I. FINDINGS OF FACT

The Federal Bureau of Investigations ("FBI") agents who detained and interviewed Guzman on the day of his arrest testified at the suppression hearing. Guzman called no witnesses.[1] After evaluating the credibility of the witnesses (including their demeanor) and the other evidence offered at the evidentiary hearing, as well as the defendant's affidavit, the Court makes the following findings of fact.

On April 23, 2010, United States Magistrate Judge William Wall issued a warrant for Guzman's arrest, charging him with knowingly and intentionally murdering Vanessa Argueta and Diego Torres. (Ex. 1.)[2] At the time the arrest warrant was issued, officials believed Guzman to be in El Salvador. (Tr. 45:17-20.) Officials placed Guzman's arrest warrant in the NCIC database that tracks fugitives and alerts law enforcement officials when a fugitive surfaces in some way. (*Id.* 45:21-46:8.)

On May 17, 2010, FBI Special Agent Kathryn Weidman was alerted that Guzman was scheduled to arrive at Miami International Airport early that evening. (*Id.* 4:22-5:6.) Guzman arrived at the airport aboard American Airlines flight 926, arriving from El Salvador. (*Id.* 5:7-13; Ex. 3.) Weidman and two officers from the United States Customs and Border Patrol ("CBP") met the plane at the gate. (Tr. 6:6-7.) The two CBP officers conducted a check of all passengers on the flight, identified Guzman as the fugitive sought, and placed him in custody. (*Id.* 6:13-7:9, 8:14-18.) The CBP officers conducted a pat-down of Guzman and placed him in handcuffs. (*Id.* 8:16-18.) Guzman was transported to the CBP holding area in the Terminal E office sometime between 6:30 and 7:00 p.m. (*Id.* 8:16-9:2.)

Once inside the CBP holding area, Guzman was processed and then handcuffed by one hand to a bench in the general area of the office. (*Id.* 9:5-7.) Guzman was offered food and drink and allowed to use the

---

[1] However, Guzman did submit an affidavit in which he stated, *inter alia*, "During that entire period of time [between 6:00 p.m. and 10:30 p.m.] I requested an opportunity to call my mother who was in New York. Each time I requested to call my mother I was ignored. Throughout this entire time I was handcuffed." (Guzman Aff. at ¶ 4.) Guzman also stated that at approximately 10:30 p.m., when FBI agents and Suffolk County detectives began their questioning, "I answered their questions, however, I again requested a chance to speak with my mother and was denied. I was advised that unless I started answering their questions, I would never see or talk to my mother again. I was repeated [sic] threatened that if I did not cooperate with the agents/detectives that I would receive the death penalty. Agents/detectives yelled at me about telling them the truth while merely inches from my face. They stood around me almost encircling me while they repeatedly refused my request to speak to my mother. Up to this point, I was never advised of my rights to remain silent and/or speak to an attorney." (*Id.* at ¶ 5.) Guzman stated, *inter alia,* that he signed the Advice of Rights form, "after being threatened for over thirty minutes by the agents/detectives." (*Id.* at ¶ 6.) Guzman stated that the agents/detectives threatened to hit him and threatened that Guzman would receive the death penalty. (*Id.* at ¶ 7.) To the extent Guzman's affidavit conflicts with the testimony of the interviewing agents, the Court finds Guzman's version to be wholly incredible in light of the totality of the evidence, including the Court's evaluation of the credibility of the FBI agents who testified at the hearing. Instead, having conducted the hearing, the Court finds the agents' version of events (discussed *infra*) to be fully credible.

[2] "Ex." refers to exhibits admitted during the December 5, 2011 suppression hearing, and "Tr." refers to citations to the transcript of the evidentiary hearing.

3

bathroom, if necessary. (*Id.* 9:12-15.) Guzman remained handcuffed to the bench until around 10:30 p.m., when Special Agent Sean McMullen, a Special Agent in the Long Island Division of the Federal Bureau of Investigations, arrived to question Guzman. (*Id.* 9:16-18, 10:11-13.) Between his arrival at the CBP holding area and 10:30 p.m., Guzman left the bench with an escort to use the bathroom. (*Id.* 21:17-22:5.) While in the CBP holding area, Guzman did not ask to speak to his mother or an attorney. (*Id.* 9:19-24.)

When Agent McMullen arrived at the CBP office, he identified himself to Guzman and informed Guzman that there was a warrant out for his arrest for the murders of Argueta and Torres. (*Id.* 47:8-15.) At that time, Agent McMullen did not question Guzman regarding the Argueta and Torres murders or Guzman's alleged involvement in La Mara Salvatrucha ("MS-13"), a street gang with members on Long Island. (*Id.* 47:16-21.) Guzman's demeanor was calm throughout this encounter. (*Id.* 47:22-23.)

Agents McMullen and Weidman moved Guzman into an interview room in the CBP office.[3] (*Id.* 10:22-25, 48:18-19.) The room was windowless, as the office was underground; however, there was an observation window in the door that opened to the CBP office. (*Id.* 27:4-9, 32:3-4, 69:12-14.) After Guzman was placed in the room, Agent McMullen stepped out with Agent Weidman to give her basic facts about the case. (*Id.* 48:20-49:4.) Both agents entered the room, and Agent McMullen again advised Guzman of the reason for his arrest. (*Id.* 49:5-9.)

Agent McMullen then advised Guzman of his *Miranda* rights from an "Advice of Rights" form. (*Id.* 49:10-15; Ex. 2.) Agent McMullen read from the form, and then asked Guzman to read and repeat the rights out loud. (Tr. 49:10-15.) Guzman initialed each line under "Your Rights" with his initials "AG." (*Id.* 49:16-17, 50:23-25; Ex. 2.) Guzman signed under the "Waiver of Rights" section, which stated, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (Ex. 2.) Guzman never appeared to have trouble understanding what the agents were saying (Tr. 49:22-25, 78:16-20); he also never stated that he did not understand his rights. (*Id.* 52:20-23.) Guzman did not ask to speak with an attorney. (*Id.* 15:5-6, 53:2-3.) Guzman did not ask to speak with his mother. (*Id.* 52:24-53:1.)

At the time of his arrest, Guzman was four days away from his eighteenth birthday. (Ex. 4.) Agent McMullen was aware that Guzman was a juvenile and was also aware of the procedures for juvenile arrests. (Tr. 66:22-24, 60:20-61:2.) Agent McMullen also was aware of the identity of Guzman's mother, and he knew that Guzman had lived with her in Central Islip. (*Id.* 58:14-18.) Agent McMullen did not contact Guzman's mother to notify her of Guzman's arrest before his interview with Guzman. (*Id.* 60:17-19.) Agent McMullen had received permission from his supervisor and the U.S. Attorney's Office to interview Guzman without notifying his mother. (*Id.* 60:23-61:5.) McMullen testified that the decision not to notify Guzman's mother was made because Guzman's mother helped Guzman

---

[3] There is conflicting evidence regarding whether Guzman was handcuffed in the interview room. Agent Weidman testified that Guzman was handcuffed by one hand to the bench. (Tr. 10:23-11:2.) Agent McMullen testified that Guzman was not handcuffed in the interview room. (*Id.* 68:18-21.) Based upon the agents' testimony, the court assumes for purposes of this motion that Guzman was handcuffed by one hand to the bench.

4

and his two co-conspirators flee to El Salvador, sent Guzman money and cell phones while Guzman was in El Salvador, and indicated on taped phone calls that she was aware of the murders. (*Id.* 60:2-8, 61:7-16.) At the time of the interview, two FBI agents were in El Salvador looking for Guzman and his co-conspirator known as Cruzito ("Cruzito"), and they had honed in on a general location for Cruzito. (*Id.* 61:20-62:10, 77:23-78:15.) Agent McMullen was concerned that Guzman's mother or his friends and family would alert Cruzito to the arrest and cause him to flee the location. (*Id.* 62:2-63:1.) Agent McMullen was also concerned for the safety of the FBI agents in El Salvador if Guzman's mother was alerted to the arrest.[4] (*Id.* 66:1-5.)

After administering the *Miranda* warnings and obtaining Guzman's written waiver, Agent McMullen began questioning Guzman with Agent Weidman present in the interview room. (*Id.* 15:10-16, 53:10-13.) Guzman stated that he had been a member of MS-13 since he was approximately ten years old. (*Id.* 54:18-24; Ex. 3.) Guzman joined a MS-13 clique in California before moving to Central Islip, New York. In Central Islip, Guzman joined the Islip Locos Salvatruchos clique of MS-13. (Tr. 55:10-12; Ex. 3.)

Guzman stated that he had heard that Cruzito killed Argueta and Torres. (Ex. 3.) Agent McMullen stated that this information contradicted what he and other officials knew to be the facts of the case. (Tr. 71:25-72:5; Ex. 3.) Guzman then stated that he was with Cruzito and another MS-13 member, known as Zorro ("Zorro"), along with Argueta and Torres, on the day of the murders, but that he did not go into the woods where Argueta and Torres were killed. (Ex. 3.) Agent McMullen again stated that this information contradicted what he and other officials knew to be the facts of the case. (Tr. 71:25-72:5; Ex. 3.)

About one and one-half hours into the interview, Gerard McAlvin and Robert Chase, detectives from the Suffolk County Police Department, entered the interview room. (Tr. 72:10-13; Ex. 3.) Guzman then stated that he entered the woods with Cruzito and Zorro, and Zorro shot Argueta twice and Cruzito shot Torres twice. (Ex. 3.) Guzman was again informed that this information contradicted what Agent McMullen knew to be the facts of the case. Guzman then stated that, on the day before the murder, Cruzito, Zorro and Guzman agreed that a "mission" was necessary to kill Argueta. (*Id.*) The next day, Cruzito picked up Guzman from the Auto Zone in Central Islip. Argueta and Torres were already in the car. (*Id.*) They traveled to pick up Zorro in Patchogue. (*Id.*) They then drove to another house where an MS-13 member provided them with a gun. (*Id.*) They traveled to a wooded area, where they exited the car and walked into the woods. Zorro shot Argueta once in the temple, and then Guzman shot her in the chest. (*Id.*) Cruzito then shot Torres twice in the head. (*Id.*) Cruzito, Zorro and Guzman ran out of the woods and drove away. (*Id.*) Cruzito wiped down the gun with his socks and then returned it to the MS-13 member who had provided the gun earlier in the day. (Tr. 54:7-11; Ex. 3.) Cruzito, Zorro and Guzman then fled to El Salvador. (Tr. 54:12-14; Ex. 3.)

Guzman also explained the purpose behind his tattoo of three dots on his knee. Guzman stated that the three dots stand for how he will live his life as a member of MS-13: death, penalty, and thinking. (Tr. 55:13-23, Ex. 3.) Guzman explained that the dot

---

[4] Guzman's mother was notified of his arrest when Guzman was going to court. (Tr. 60:9-16.)

that represents thinking signifies that he is a "thinker." (Tr. 55:16-23, Ex. 3.)

The interview lasted between three and three and one-half hours. (Tr. 63:2-3, 73:23-25.) Guzman's demeanor was calm throughout the entire interview. (*Id.* 63:12-14.) Guzman, the agents and the detectives remained seated throughout the interview; the agents and detectives stood only to walk in and out of the room. (*Id.* 74:18-24.) Guzman requested and was given candy bars and fruit punch during the interview. (*Id.* 63:4-11.) Guzman never requested to speak with his mother or an attorney throughout the interview, and he never exercised his right to remain silent or requested that the questioning cease. (*Id.* 64:13-21.) Guzman was not threatened with physical violence or the death penalty during the interview. (*Id.* 19:18-19, 37:19-22, 63:19-23.) The agents and detectives did not yell at Guzman at any point in the interview. (*Id.* 19:15-17.)

II. Discussion

A. Legal Standard

1. Waiver of *Miranda* Rights

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court determined that "in order to combat [the pressures surrounding in-custody interrogations] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Id.* at 467. Accordingly, "prior to the initiation of questioning," the government must inform a suspect of "the [government's] intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if [he] so desires.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda*, 384 U.S. at 468-70). Once an accused is apprised of these rights, he may waive them "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444; *Moran*, 475 U.S. at 421 (quoting *Miranda*).

When a defendant moves to suppress a statement that he claims was obtained in violation of *Miranda*, the government has the burden of proving by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver of the defendant's *Miranda* rights. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). For a waiver to be voluntary, the waiver must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. In addition, for a defendant to make a knowing and intelligent waiver, he must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* However, the accused need not "know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Instead, the accused need only be aware that "he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.*

"Whether a waiver is 'knowing and voluntary' is a question directed to a defendant's state of mind, which can be inferred from his actions and statements." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993). Further, as the Supreme Court has stated, "the question of waiver must be determined on 'the particular facts and circumstances surrounding [the] case, including the background, experience, and

6

conduct of the accused.'" *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). The totality of the circumstances also is properly utilized in determining whether there has been a waiver where the interrogation of juveniles is involved. *Fare v. Michael C.*, 442 U.S. 707, 724-25, 99 S. Ct. 2560 (1979); *see also United States v. Burrous*, 147 F.3d 111, 116 (2d Cir. 1998) ("In the case of interrogation of a juvenile, we examine the totality of the circumstances culminating in the waiver."). As the Supreme Court has explained,

> This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits – indeed, it mandates – inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Fare*, 442 U.S. at 725 (citation omitted).

Moreover, there is no constitutional right for a juvenile to have a parent or guardian present during questioning. *See, e.g.*, *see Fare*, 442 U.S. at 723-27 (declining to hold that 16-year old's waiver of *Miranda* rights in the absence of a friendly adult, i.e., a probation officer, was *per se* involuntary); *see also Hall v. Thomas*, 611 F.3d 1259, 1289 (11th Cir. 2010) ("In any event, even if [the juvenile] had requested the presence of his father, this request would not automatically render his waiver and confession involuntary as a matter of federal law. Regardless of what Alabama law requires, there is no clearly established federal constitutional requirement: (1) that police officers advise juveniles, suspected of state crimes, of a right to have a parent present during questioning, or (2) that interrogation cease upon a juvenile's request for the presence of a parent or guardian."); *Hardaway* v. *Young*, 302 F.3d 757, 763 (7th Cir. 2010) ("[T]he mere absence of a friendly adult is by itself insufficient to require suppression of a juvenile confession."); *Blankenship v. Estep*, No. 05-CV-02066-WDM-KLM, 2008 WL 4964712, at *4 (D. Colo. Nov. 18, 2008) ("it is not a fundamental right to have a parent or guardian present during Miranda advisements and waivers by juveniles").

However, an arrestee's juvenile status and the absence of a parent are certainly important factors that must be considered in assessing the voluntariness of a juvenile's statement. *See, e.g.*, *Doody v. Schriro*, 548 F.3d 847, 867 (9th Cir. 2008) ("Even though [the juvenile] agreed at the outset to speak to the officers without his parents present, the absence of a friendly adult is a factor in assessing the voluntariness of a juvenile's confession."); *Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) ("[T]he absence or presence of a parent or other friendly adult [is an] additional factor[ ] that bear[s] on the voluntariness of the juvenile's confession."); *Hardaway*, 302 F.3d at 765 ("Even refusing a child's request to have a parent or other friendly adult (other than a lawyer) present is not enough to suppress the confession if other factors indicate that the confession was

7

voluntary, and Hardaway made no such request here. However, in marginal cases – when it appears the officer or agent has attempted to take advantage of the suspect's youth or mental shortcomings – lack of parental or legal advice could tip the balance against admission." (quotations and citations omitted)).

Thus, the Supreme Court has warned that, in assessing the voluntariness of juvenile confessions, a court must exercise "special caution." *In re Gault*, 387 U.S. 1, 45 (1967). In *In re Gault*, the Supreme Court explained:

> [T]he constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults. We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique – but not in principle – depending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.

*Id.* at 55; *see generally J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2403-06 (2011) (discussing issue of child's age in context of *Miranda* custody analysis).

2. Juvenile Delinquency Act

Under the Juvenile Delinquency Act ("JDA"),

> [w]henever a juvenile is taken into custody for an alleged act of juvenile delinquency, the arresting officer shall immediately advise such juvenile of his legal rights, in language comprehensive to the juvenile, and shall immediately notify the Attorney General and the juvenile's parents, guardian, or custodian of such custody. The arresting officer shall also notify the parents, guardian, or custodian of the rights of the juvenile and of the nature of the alleged offense.
>
> The juvenile shall be taken before a magistrate judge forthwith. In no event shall the juvenile be detained for longer than a reasonable period of time before being brought before a magistrate judge.

18 U.S.C. § 5033. Neither the Supreme Court nor the Second Circuit has decided whether the failure to notify a parent or guardian under this statute gives rise to a suppression remedy. *See Burrous*, 147 F.3d at 116 ("In view of this tension, we decline to decide whether, and if so, when a failure to notify may give rise to a suppression remedy under section 5033. We hold only that Burrous' statements, taken after a repeated and fruitless good faith inquiry designed to locate the detained juvenile's parents, were admissible in evidence."). In other words, although the Supreme Court has held that the "totality of the circumstances" test applies generally to statements by juveniles, it has not addressed whether the test should apply if a violation of the JDA occurs due to a failure to notify

8

the parents after the juvenile's arrest, as required under Section 5033.

In evaluating whether violations of the JDA's parental notification requirement automatically require a suppression remedy, this Court looks to the general purpose of the exclusionary rule and guidance from the Supreme Court and other circuits in analogous circumstances. The exclusionary rule is a prudential doctrine created by the Supreme Court to "compel respect for the constitutional guaranty." *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (quoting *Elkins v. United States*, 364 U.S. 206, 217, (1961)). The exclusionary rule "is not a remedy we apply lightly." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 347, 126 S. Ct. 2669 (2006). The Supreme Court has emphasized that "the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging the application of the rule." *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364-65 (1998) (quoting *United States v. Payner*, 447 U.S. 727, 734 (1980)).

This Court holds that violations of the JDA's parental notification requirement do not require a *per se* suppression remedy. First, the JDA is a statute, not a constitutional rule requiring heightened protection. *See United States v. Donovan*, 429 U.S. 413, 432 n.22 (1977) ("The availability of a suppression remedy for . . . statutory, as opposed to constitutional violations . . . turns on the provisions of [the statute] rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights."); *United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) ("[i]n the statutory context, suppression is a creature of the statute, and its availability depends on the statutory text"); *United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006) ("Although exclusion is the proper remedy for some violations of the Fourth Amendment, there is no exclusionary rule generally applicable to statutory violations.").[5]

Second, there is nothing in the statute's text which indicates that Congress believed the rights conferred under Section 5033 of the JDA were critical enough to warrant such a drastic remedy. The plain language of the statute does not require suppression when the JDA's parental notification requirement has been violated. Of course, Congress knows how to create such a remedy in a statute if it wishes and, thus, its absence from Section 5033 of the JDA supports the conclusion that Congress did not intend to provide a suppression remedy for a violation of the parental notification provision of the JDA. As Congress did not provide for such a remedy, it is not the role of the Court to judicially impose one. *See Clenney*, 631 F.3d at 667 ("Congress has shown that it knows how to create a statutory remedy. It did so in 18 U.S.C. § 2515, which provides for suppression of evidence obtained in violation of the statutes governing wiretaps. Yet it chose not to do so in the context of § 2703(c) violations. Therefore, Congress has made clear that it did not intend to suppress evidence gathered as a result of § 2703(c) violations.") Additionally, if Congress intended to prevent questioning of a juvenile without parental involvement, it could have included an additional provision in the JDA that required law enforcement officials to notify the juvenile that his or her parent could be present and/or that gave the parent the right to be present at the juvenile's interrogation. In short, the statutory text does not suggest,

---

[5] Though many cases discuss statutory violations in the context of Fourth Amendment concerns, the considerations are the same when the statute implicates the Fifth Amendment. *See Sanchez-Llamas*, 546 U.S. at 2681.

9

in any way, that Congress intended a *per se* suppression remedy for violations of the JDA's parental notification requirement.

Third, a *per se* exclusion of statements obtained after violations of the JDA's parental notification requirement could lead to absurd results that Congress clearly would not have intended by passing the law. For example, there may be situations where law enforcement officials have compelling reasons not to notify a parent before questioning the juvenile. The juvenile's parent may have played some role in the alleged criminal enterprise, and notifying a parent may alert the criminal enterprise to police suspicion. Under such circumstances, law enforcement officials may be legitimately concerned about the safety of undercover agents, the destruction of evidence, or the flight of suspects. Additionally, a juvenile may lie about his age (and say he is over 18), not necessarily to induce violations of the JDA's parental notification requirement, but rather to avoid criminal prosecution, as may be the case if a juvenile is apprehended with false identification indicating an age above eighteen. A *per se* exclusion under Section 5033 would punish law enforcement officials who reasonably rely on a juvenile's representations. Finally, one could have the situation where a juvenile may turn from seventeen to eighteen years old over the hours he is in custody, and a *per se* rule could require the court to suppress the juvenile's statement if there was no parental notification at the time of arrest, even though he was 18 years-old at the time of his actual questioning.[6] In short, a *per se* suppression rule for violations of the parental notification requirement has no support in the plain text of the law or logic, and this Court declines to adopt it.

In fact, both the Sixth and Ninth Circuits have similarly held that the failure to notify a parent upon arrest under the JDA does not lead to *per se* exclusion of the juvenile's post-arrest statements. However, these Circuits have developed different tests to analyze violations of the JDA's parental notification requirement. The Sixth Circuit has held that the failure to notify a juvenile's parents does not require a *per se* exclusion of the juvenile's confession; instead, "the admissibility of [the juvenile's] statements is still a function of whether they were knowingly and voluntarily made." *United States v. Doe*, 226 F.3d 672, 679 (6th Cir. 2000). The Ninth Circuit, however, has held that when Section 5033 of the JDA is violated, the court must first evaluates "whether the government's conduct was so egregious as to deprive [the juvenile] of his right to due process of law." *United States v. Juvenile Male*, 595 F.3d 885, 902 (9th Cir. 2010) (quoting *United States v. D.L.*, 453 F.3d 1115, 1120 (9th Cir. 2006) (internal quotation marks omitted)). If the court does not reverse based on a due process violation, the court must consider whether the "violation was harmless to the juvenile beyond a reasonable doubt." *Id.* (quoting *D.L.*, 453 F.3d at 1120). If the violation caused prejudice to the defendant, the court has "discretion to reverse the conviction or order other more limited remedies so as to ensure that the 'prophylactic safeguard for juveniles not be eroded or neglected.'" *Id.* at 903 (quoting *U.S. v. Wendy G.*, 255 F.3d 761, 765 (9th Cir. 2001)). When assessing prejudice, the Ninth Circuit considers first whether any of the violations of the JDA caused the juvenile's statement. *Id.* at 903. If so, the court next considers whether the

---

[6] Although such a situation may seem unlikely, it could have occurred in this case had Guzman been arrested at the airport (at the exact same time) only three days later on the night of May 20, 2010, which would have resulted in him turning 18 years-old (on May 21, 2010) while in custody.

juvenile was prejudiced by his statement. *Id.* at 904.[7]

### B. Analysis under the Sixth Circuit Standard

The Court finds the Sixth Circuit's legal framework regarding the JDA parental notification requirement in the context of a motion to suppress a juvenile's post-arrest statements to be persuasive and adopts it as the applicable standard. Accordingly, the Court holds that the failure to notify a parent or guardian under Section 5033 after the juvenile's arrest (and the absence of such parent at questioning) is one of the factors that the Court is to consider when evaluating the totality of the circumstances surrounding a juvenile's statements to law enforcement, in order to determine whether the *Miranda* waiver was valid. Although "special caution" is required in assessing such situations under the totality of the circumstances, the Court declines to impose a heightened test such as the one articulated by the Ninth Circuit.

As an initial matter, in applying the Sixth Circuit test, it is important to note that Guzman does not dispute that he was read *Miranda* warnings or that he speaks English. Instead, Guzman asserts that the agents and detectives threatened him with physical violence and the death penalty if he did not confess to the murders. Guzman also contends that he repeatedly requested to speak with his mother or an attorney, but was denied. Guzman argues that, because of these events, he did not knowingly and voluntarily waive his *Miranda* rights. Guzman also suggests that his mental capacity is diminished, and therefore his waiver was not knowing and voluntary. For the reasons that follow, the Court finds that the government has met its burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights.

In applying the totality of the circumstances test, the Court considers: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of the law enforcement officials. The relevant characteristics of the individual who confessed are the individual's experience and background, together with the suspect's youth and lack of education or intelligence." *Green v. Scully*, 850 F.2d 894, 901-902 (2d Cir. 1988). The Court will address each of these factors in turn.

1. Guzman's Personal Characteristics

Guzman's personal characteristics strongly support a finding that the waiver

---

[7] Although the Second Circuit has never addressed this issue, Judge Newman did discuss this issue in a dissent. *See, e.g.*, *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 43-44 (2d Cir. 1997) (Newman, J., dissenting). In particular, in determining whether a Section 5033 violation requires suppression, Judge Newman proposed a test similar to the one articulated by the Ninth Circuit. *Id.* at 44 ("It may well be that not every instance of noncompliance with the requirements of section 5033 invalidates a juvenile's confession. *See United States v. Doe*, 701 F.2d 819, 822-23 (9th Cir. 1983) (prompt notification excused where parents outside the United States). But where compliance is readily feasible, lack of compliance ought not to be excused unless it appears, with reasonable certainty, that the noncompliance did not contribute to obtaining the confession."). Applying that test, Judge Newman concluded that the statement in that case should have been suppressed because "[t]he likelihood is that the mother, informed of her son's peril and of his rights, would have advised him not to speak to the agents before obtaining legal representation." *Id.* The majority, however, declined to address this issue at all because it found the issue was not raised in the district court or on appeal, and was therefore waived. *Id*. at 42 n.5 (Meskill, J.).

was knowing, intelligent, and voluntary.[8] Guzman was just four days shy of his eighteenth birthday at the time of his confession, and he had lived independent of his mother in El Salvador for several months. Guzman was born in the United States and was familiar with the criminal justice system by virtue of having been arrested on several occasions and detained in a juvenile correction facility. (Ex. 6, Ex. 8.) Though Guzman's scaled IQ score of 66 on the Wechsler Abbreviated Scale of Intelligence exam is in the deficient range of intellectual functioning, (Ex. 8) Guzman is not mentally retarded. (*Id.*) Additionally, as the Court found in the opinion transferring Guzman to adult status,

> As Dr. Drob explained in his report, the defendant's overall low score was "compromised by a very deficient performance on the Block Design subtest," which is a nonverbal test of perceptual motor ability. (Dr. Drob Report at 5; *see also* Tr. at 19:15-20:1.) In contrast, the defendant's performance on a vocabulary test was much better, and, in fact, Dr. Drob found the defendant's reading skills to be "rather impressive." (Dr. Drob Report at 5.) Indeed, the defendant told Dr. Drob that "he has always enjoyed reading" (*id.* at 3) and that "he reads books and newspapers quite regularly." (Tr. at 14:25-15:1.) These statements are consistent with the defendant's high marks in some of the subjects he studied while at OCFS-Brookwood, including a 93 in New York State History, an 85 in English, and an 88 in American History. (*See* Dr. Drob Report at 5.)

*United States v. Juvenile Male*, No. 10-cr-421(JFB), Memorandum and Order at 10, Dec. 14, 2010, ECF No. 29. The Court notes that Dr. Drob found that, based on the Rorschach Inkblot Method ("RIM") exam, defendant had a "very high elevation" on a scale of borderline tendencies, which led Dr. Drob to conclude that Guzman's level of maturity was well below what would be expected for others his age. (Ex. 11, Transfer Tr. at 21:22-23, 22:24-23:3). However, the Court also finds the following facts, in conjunction with the other evidence discussed *infra*, demonstrate that Guzman can form a knowing, intelligent and voluntary waiver of his *Miranda* rights: Dr. Drob found that (1) defendant only lacked the maturity of a "well functioning" adult (*id.* at 26:1-6), (2) defendant was capable of logical and coherent thinking (*id.* at 25:10-11), and (3) defendant's results on the RIM could have been the result, at least in part, of emotional impairments, as opposed to solely the result of cognitive deficits. (*Id.* at 24:14-20.) *See, e.g.*, *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 40 (2d Cir. 1997) ("However, even if we were to consider the psychological reports along with the mother's testimony of defendant's mental disabilities, we still would reject defendant's argument as to competency. The evidence of defendant's disabilities does not show that defendant was so incompetent that he was not aware "both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573, 107 S. Ct. 851, 857, 93 L.Ed.2d 954 (1987) (quotation omitted). Although his mother's testimony and the psychological reports indicate that

---

[8] In evaluating the characteristics of Guzman, the Court notes that there has been extensive evidence on Guzman's experience, background, education and intelligence at the transfer hearing in this case. The Court evaluated the report and testimony of psychologist Dr. Sanford Drob, which was again presented as evidence at the suppression hearing and evaluated in connection with this motion.

defendant has a host of attentional and learning disabilities, nothing in the testimony or psychological reports indicates that defendant could not comprehend the rights that were explained and read to him.").

2. Conditions of the Interrogation

The Court finds that, although Guzman was detained, handcuffed to a bench, for nearly four hours prior to the start of the interview, the overall circumstances of the interrogation also support a finding that Guzman's waiver of his *Miranda* rights was still knowing, voluntary and intelligent. *See, e.g.*, *United States v. Mikelic*, No. 3:10-cr-132 (CFD), 2011 WL 4368565, at *13 (D. Conn. Sept. 19, 2011) ("The Court finds that Mikelic voluntarily waived his Miranda rights in the restaurant parking lot. As discussed in the foregoing analysis, Mikelic indicated to Agent Rubinstein that he understood his rights but that he wanted to answer some questions. Although Mikelic was handcuffed at the time with his hands behind his back, there are no other circumstances suggesting that Mikelic's waiver of his rights was coerced; Mikelic was only in the back of the law enforcement vehicle for approximately ten or fifteen minutes after being advised of his Miranda rights and there is no indication that the law enforcement officers' conduct was coercive."); *see also United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004) ("This record supports the District Court's finding that the consent given to enter the house was voluntary. The fact that police drew their guns to effectuate the arrest does not necessarily establish coercion, neither does the fact that Gates was handcuffed.").

Though handcuffed to a bench in the CBP office, Guzman was allowed to use the bathroom if requested (Tr. 9:12-15), which he did, (*id.* 21:21-22:5) and he was not subject to any substantive questions while in this area. (*Id.* 9:25-10:1, 23:24-24:7, 47:16-18.) When Agent McMullen arrived, he immediately informed Guzman of the alleged crimes. After the interview began, Guzman was given food and drink when he requested it. The size of the room where the interview took place was an adequate size and had a window to the CBP office. The interview lasted three and one-half hours. Nothing regarding the conditions of the interrogation suggests that Guzman's will was overborne.

3. Conduct of Law Enforcement Officials

The Court finds that the conduct of the law enforcement officials involved in Guzman's arrest, detention and interview also support a finding that Guzman's waiver was constitutionally valid. First, as noted *supra*, the Court finds that Agent Weidman's description of Guzman's arrest, detention at CBP, and subsequent interview is fully credible. The Court finds that Guzman's demeanor was calm, and that at no time did Guzman request that his mother be contacted. Second, the Court finds that Agent McMullen's description of his administration of the *Miranda* warnings and of Guzman's subsequent waiver was also fully credible. At no time did Guzman indicate that he did not understand the warnings. The Court finds that Guzman never requested to speak with his mother or an attorney. Moreover, contrary to Guzman's affidavit, the Court finds that the agents and detectives did not threaten Guzman with physical violence or the death penalty during the interview, or in any other way.

Although Agent McMullen did fail to notify Guzman's mother, the Court finds that his reasons for declining to notify

Guzman's mother are credible and compelling. Guzman's mother had been in contact with Guzman and other suspected gang members in El Salvador. FBI agents were in El Salvador looking for Cruzito, and they had honed in on a general location for him. Agent McMullen was legitimately concerned that Guzman's mother would alert Cruzito to the arrest and cause him to flee. The Court finds that these concerns regarding safety and an ongoing fugitive investigation provided compelling grounds under the particular circumstances of this case for not notifying Guzman's parents. There is no basis whatsoever to conclude that the decision to not comply with the statute was the product of a desire to gain an unfair tactical advantage in the interrogation or to violate Guzman's constitutional rights. Additionally, there is simply no indication that the failure to notify Guzman's mother affected Guzman's waiver of his *Miranda* rights in any way.

In sum, the Court recognizes that the failure to notify Guzman's mother of his arrest as required under Section 5033 and the absence of a parent during questioning require this Court to exercise special care in assessing whether this juvenile knowingly, intelligently, and voluntarily waived his *Miranda* rights. However, when those factors are balanced against the other factors that relate to the circumstances surrounding the interrogation – including (1) Guzman's age (4 days from his eighteenth birthday), experience with law enforcement, education, background, and intelligence, (2) his clear capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights, and (3) the conditions of the questioning and the agents' conduct – the Court finds that the totality of the circumstances demonstrate that his waiver was knowing, intelligent, and voluntary.

Accordingly, the Court concludes that the government has met its burden and the motion to suppress is denied.

### C. Analysis under the Ninth Circuit Standard

Though the Court adopts the Sixth Circuit's standard, the Court concludes, in the alternative, that it would reach the same result under the Ninth Circuit's standard. First, the Court finds that law enforcement official's conduct was not "so egregious as to deprive [Guzman] of his right to due process of law." *Juvenile Male*, 595 F.3d at 902. Agent McMullen provided a credible and compelling explanation for why Guzman's mother was not contacted. Guzman was still provided with his *Miranda* warnings, and (as noted above) there is nothing to suggest that the agents or detectives sought to withhold information from Guzman's mother to gain an improper advantage in the interrogation. Additionally, the Court finds that Guzman was not prejudiced by the violation. There is nothing to suggest that Guzman relied heavily on his mother for guidance. Guzman joined MS-13 at age ten (Ex. 3), and had spent three years in juvenile detention. (Ex. 8.) Guzman traveled to El Salvador without his mother and returned to the United States by himself. Given these circumstances, the Court finds that the violation of the JDA's parental notification requirement did not cause the juvenile's statement and, thus, did not prejudice him in any way. Instead, it is the Court's conclusion that, had the parental notification been made, that Guzman's *Miranda* waiver and interrogation still would have occurred exactly as it did on that date absent that notification.[9] In short, the

---

[9] The Ninth Circuit has suggested that a violation of Section 5033 is prejudicial to a juvenile because the parents, if properly notified, could have requested to communicate and confer with the juvenile before

violation was harmless to Guzman beyond a reasonable doubt.

### III. CONCLUSION

For the foregoing reasons, the defendant's motion to suppress is denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 26, 2012
      Central Islip, New York

---

questioning and that request, which would have to be honored by the police, could result in the juvenile declining to waive his rights. *See, e.g.*, *United States v. Doe*, 219 F.3d 1009, 1017 (9th Cir. 2000) ("We therefore hold that if the juvenile or his parents request to communicate and confer with each other prior to questioning, such a request may not be unreasonably refused."). This Court disagrees. As discussed *supra*, there is nothing in Section 5033 or in the Constitution that provides a right by a parent or guardian to speak to a juvenile before interrogation. Thus, even if Guzman's mother had been notified and asked to speak to Guzman, such a request could have been rejected by the police. In any event, even assuming *arguendo* that such a right to talk to a juvenile generally exists and cannot be unreasonably refused, refusal by the agents to allow such conferral in this case by telephone with the mother would have been reasonable in light of the concerns about the mother's assistance to MS-13 gang members. Moreover, there is no indication in the record as to what the mother would have advised Guzman to do even if she had consulted with him. Accordingly, under the particular circumstances of this case, the failure to notify Guzman's mother under Section 5033 did not cause his *Miranda* waiver.

\* \* \*

The United States is represented by Loretta E. Lynch, U.S. Attorney, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201 by John J. Durham and Raymond A. Tierney, Assistant U.S. Attorneys. Defendant Aldalberto Ariel Guzman is represented by Steven Losquadro, Steven Losquadro, P.C., 649 Route 25A, Suite 4, Rocky Point, NY 11778.